**THIRD DIVISION**
**ELLINGTON, P. J.,**
**ANDREWS and RICKMAN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**November 2, 2017**

# In the Court of Appeals of Georgia

A17A1031. EMM CREDIT, LLC v. ALEXANDER REMINGTON et al.

RICKMAN, Judge.

Nearly 13 years after filing suit, EMM Credit, LLC prevailed in a jury trial against defendants Alexander Remington, Cara Guri, and American National Holding Corporation ("ANHC"). EMM Credit sought a declaratory judgment that Remington is the "true owner" of ANHC, meaning that Remington owns all of the shares of ANHC, and sought to set aside as fraudulent the conveyance of certain property from Remington to ANHC. The jury determined that Remington is the true owner of ANHC and that Remington fraudulently transferred property to ANHC. The trial court subsequently issued an order granting "Defendants' Renewed Motion for Directed Verdict/Motion for Judgment Notwithstanding the Verdict." EMM Credit

appeals that order , contending that the trial court erred in granting a directed verdict on its declaratory judgment and fraudulent transfer claims and by refusing to admit certain evidence at trial. For reasons that follow, we affirm in part and reverse in part.

> On appeal from a trial court's rulings on motions for directed verdict and judgment notwithstanding the verdict, we review and resolve the evidence and any doubts or ambiguities in favor of the verdict; directed verdicts and judgments notwithstanding the verdict are not proper unless there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, demands a certain verdict.

(Citations and punctuation omitted.) *Vol Repairs II Inc. v. Knighten*, 322 Ga. App. 416, 417 (745 SE2d 673) (2013).

So viewed, the evidence shows that in July 1997, Alexander Remington became a director of NewCom, Inc., now known as NCom, Inc. ("NCom"). Remington was also the majority owner of Micro Equipment Corporation ("MEC"), one of NCom's largest suppliers. In 2002, Remington entered a plea agreement in which he admitted to engaging in a scheme to defraud and embezzle money from NCom by padding invoices from MEC to NCom. This scheme began in 1996 and continued until 1999, resulting in the embezzlement of approximately $1,100,000.

2

Remington pled guilty to and was convicted of committing mail fraud and wire fraud in federal court in California.

After learning about Remington's guilty plea and investigating the nature of the crime, NCom demanded payment from Remington. When those demands went unanswered, NCom filed suit in federal court in California in 2003, and in 2006, obtained a $2,533,000 judgment for intentional fraud against Remington, MEC, and Cara Guri, MEC's chief financial officer and Remington's girlfriend. While the California litigation was ongoing, NCom discovered that in 1996, Remington had purchased an industrial building in Gwinnett County, Georgia, and immediately transferred it to ANHC. In 2003, NCom filed suit in Georgia against Remington, Guri, ANHC, and others, seeking, inter alia, a declaration that Remington owns all the shares of ANHC and that NCom may enforce its judgment against those shares and to void the allegedly fraudulent transfer of the Gwinnett County property (the "Property") from Remington to ANHC. In 2007, NCom assigned the California judgment to EMM Credit Corporation, who then assigned it to EMM Credit in 2008. EMM Credit was substituted as the party plaintiff in this case in 2009.

At trial in Georgia, the parties presented a significant amount of evidence about the purchase and transfer of the Property. Curt Thompson testified that he had been

the general counsel for MEC and ANHC and also served as Remington's personal attorney on occasion. He was involved in Remington's purchase of the Property in 1996 from Allstate Life Insurance Company and the subsequent transfer to ANHC. The Purchase and Sale Agreement was executed by Allstate as seller and Remington as buyer. There was an addendum to that agreement, which was prepared by counsel for Allstate, and provided that "[u]pon the Closing of the purchase of the Property, Buyer will transfer its interest in the Property to [ANHC], a Georgia corporation wholly owned by Buyer," with Buyer being defined as Remington. Thompson struck through the words "wholly owned by Buyer," and sent the document back to Allstate.[1]

At the closing, Thompson represented Remington and ANHC and Remington was present, but no other representatives of ANHC attended. Remington executed the closing documents on behalf of himself individually and Thompson executed the documents on behalf of ANHC. Remington purchased the Property from Allstate for

---

[1] Thompson testified that he struck it out because it was inaccurate. He also acknowledged later in his testimony that he had been found in contempt of court, but when asked if he had provided false information to a judge, he asserted his Fifth Amendment right not to testify further about the matter.

4

$1,540,000, then transferred it to ANHC for $800,000, and executed a note in favor of Allstate for the remaining $740,000.

In addition to the Note, Remington executed a Deed to Secure Debt and a UCC 2, pledging the Property and his personal property as collateral. ANHC also pledged certain collateral to Allstate via a UCC 2 that was prepared by Allstate and originally had a signature line for Remington, as President of ANHC, but Thompson crossed that out and signed it himself as Vice President and general counsel of ANHC.[2] Remington, Thompson, and Guri also executed a Certified Corporate Resolution of ANHC for the purchase of the Property. Remington signed the document as President/CEO of ANHC.[3] Shortly after the closing in April 1996, MEC leased the building on the Property from ANHC.

One of Remington's brothers, Seyed Hamid Zahari, also known as Gino, who claimed that he and another brother, Mohammed Zahari, also known as Tony, had been involved in ANHC since its inception in 1992 and that Remington was not involved, testified that Remington purchased the Property because he and Tony were

---

[2] Thompson testified that he crossed it out and signed his name because it was inaccurate and he was the only one authorized to sign those documents at closing.

[3] Remington also signed a signature card for ANHC's commercial checking account, as CEO of the corporation.

not sufficiently credit-worthy to complete the transaction.[4] But Gino testified that they did come up with $800,000 for ANHC's down payment, with Tony contributing $400,000 from his business in Dubai and Gino contributing $400,000 his father gave him. Gino testified that the $800,000 was wired from Dubai to the United States for the closing, but there are no records of the wire transfer. The remaining $740,000 owed to Allstate was personally guaranteed by Remington because Gino and Tony did not have the necessary credit, and was paid with funds from MEC.

The trial included extensive testimony regarding ANHC's stock ledger and stock certificates. Guri testified that the original owners of ANHC were her and Remington's brothers, Gino and Tony. Guri identified a reconstructed stock ledger for ANHC showing that she, Gino, and Tony owned shares in ANHC, and testified that the original ledger was "lost or stolen or not found." Guri also identified replacement stock certificates dated September 2006, which indicated that she owned 300 shares, Gino owned 4900 shares, and Tony owned 4800 shares. According to Guri, the original certificates were "lost, stolen; we don't know." She does not recall ever looking at the corporate books. Gino testified that the original stock certificates

---

[4] Gino's video deposition was taken in Dubai, where he resided, and was played for the jury.

were kept in a binder in Guri's office, but they were lost so they asked their attorney to prepare new ones.

EMM Credit's director testified that, during the litigation, he had requested documentation to support the defendants' claim that Gino and Tony owned ANHC, and in response, ANHC's outside counsel sent a copy of a stock ledger. When EMM Credit's director questioned the legitimacy of the ledger, ANHC's counsel responded in October 2006 that "the stock transfer record was reconstructed by my firm as ANHC's corporate counsel due to lost/destroyed old records." EMM Credit's director testified that the attorney "came up with different stories" about how they lost the originals.

At the close of EMM Credit's case, Remington, Guri, and ANHC moved for a directed verdict on several grounds, including that EMM Credit had failed to join necessary parties and that fraudulent transfer claims are not assignable. The trial court reserved ruling on the motions for directed verdict at that time and when the defendants renewed their motions at the close of the evidence. After the jury rendered its verdict that (1) Remington is the true owner of ANHC, (2) Remington fraudulently transferred the Gwinnett County building to ANHC, and (3) EMM Credit filed its

lawsuit within the applicable statute of limitations, the trial court granted defendants' renewed motion for directed verdict/motion for judgment notwithstanding the verdict.

1. EMM Credit contends that the trial court erred by granting a directed verdict or a judgment notwithstanding the verdict on its declaratory judgment claim. Specifically, EMM Credit argues that the trial court invaded the province of the jury to determine that indispensable parties were not joined and that the trial court's analysis under OCGA § 9-11-19 was incomplete and erroneous.

EMM Credit sought a declaration that Remington is the "true owner" of ANHC, meaning that Remington owns all of the shares of ANHC. At the conclusion of the trial, the jury determined that Remington was the true owner of ANHC. The trial court granted a directed verdict or judgment notwithstanding the verdict on that claim based on its determination that EMM Credit had failed to join indispensable parties, Gino and Tony Zaharai. Specifically, the court found that "at least at the time of trial, there was evidence presented that Seyed "Gino" Zaharai and Mohammad "Tony" Zaharai owned shares of stock in ANHC, and that "[a]s [EMM Credit] has failed to join these individuals as defendants in this case, [it] cannot obtain the relief [it is] seeking on this claim." The trial court did recognize, however, that the jury

8

verdict "reflects that the jury believed from the evidence presented that Defendant Remington and not the non-parties Gino and Tony was the true owner of ANHC."

(a) The trial court erred in determining that Gino and Tony were indispensable parties. Pursuant to OCGA § 9-11-19 (a),

> A person who is subject to service of process shall be joined as a party in the action if: (1) In his absence complete relief cannot be afforded among those who are already parties; or (2) He claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may . . . [a]s a practical matter impair or impede his ability to protect that interest.

The trial court determined that Gino and Tony were indispensable parties because evidence was presented that they were issued shares of ANHC.[5] Based on our review of the evidence, we conclude that the joinder of Gino and Tony was not necessary for a just adjudication of the merits of this case because their interests were adequately protected by the other defendants. See *Halta v. Bailey*, 219 Ga. App. 178, 179 (1) (464 SE2d 614) (1995) (joinder of grantee and first taker of shares of closely held stock in action for declaratory judgment and claim of fraudulent conveyance was not

---

[5] As pointed out by EMM Credit, this was actually a determination that Gino and Tony were necessary parties under OCGA § 9-11-19 (a).

9

"necessary for a just adjudication of the merits of this action, and neither is required for complete relief"). Gino's videotaped testimony was presented at trial and his testimony as to his and Tony's ownership of the shares in ANHC was consistent with testimony from Guri, another claimed shareholder and a named party, and with the reconstructed stock ledger and replacement stock certificates introduced in evidence. In addition to Thompson's testimony, appellees presented evidence from the current president of and legal custodian of corporate records for ANHC, who identified documents indicating that Tony was involved in ANHC before this lawsuit was filed and that as of July 2009, Tony was named the chief financial officer for ANHC. The appellees also presented testimony from an expert witness in the field of corporate law, who testified about the proper procedure for addressing a lost stock ledger and lost stock certificates. Thus, the appellees presented a thorough case on behalf of all of the claimed shareholders of ANHC, and their efforts to present evidence relevant to the ownership of ANHC were not hampered by the fact that Tony and Gino were not parties. Accordingly, the trial court erred in determining that Tony and Gino were indispensable parties. See *Stendahl v. Cobb County*, 284 Ga. 525, 529 (2) (668 SE2d 723) (2008) (where existing party presents a thorough case on behalf of itself and the non-party, the non-party "does not fit within the definition of 'indispensable party'

because the case could be decided on its merits without prejudicing the rights of the [non-party]"); *Halta*, 219 Ga. App. at 179-180 (1) (trial court did not err in denying motion for directed verdict for failure to add indispensable parties when one of the non-parties testified at trial and defendant's ability to present relevant testimony and evidence was not affected by whether they were parties to action).

(b) There was at least some evidence to support the jury's verdict on EMM Credit's declaratory judgment claim.

> Neither a directed verdict nor a j.n.o.v. can be granted where there is some evidence to support the verdict. Where evidence is in conflict, the grant of such motions is error. Only when there is no evidence to support the verdict can either a directed verdict or j.n.o.v. be granted, because the evidence demands a verdict contrary to that returned by the jury.

(Citations omitted.) *Rental Equip. Group, LLC v. MACI, LLC*, 263 Ga. App. 155, 157 (1) (a) (587 SE2d 364) (2003).

Appellees argue that no evidence supports this claim because EMM Credit has failed to cite to any documents or testimony showing that Remington was issued stock certificates in ANHC. But "one may have an ownership interest in a corporation without having received stock certificates." *Kueffer Crane & Hoist Svc., Inc. v.*

11

*Passarella*, 247 Ga. App. 327, 329 (2) (543 SE2d 113) (2000). And there is at least some evidence to support the jury's determination that Remington is the true owner of ANHC, including, inter alia, the closing documents, the participants at closing, Remington's potential liability on behalf of ANHC after the closing, the arguably dubious nature of the testimony regarding funding for the purchase of the Property, and the arguably suspicious timing of and explanation for the re-creation of the missing or lost or stolen stock ledger and stock certificates. See *Halta*, 219 Ga. App. at 180 (2) (plaintiff introduced sufficient evidence from which a jury could conclude that corporation was formed only to serve as a means by which to fraudulently transfer assets). "The countervailing evidence, [even if substantial], could be disbelieved by the jury and did not authorize the court to grant a directed verdict." *Teklewold v. Taylor*, 271 Ga. App. 664, 667 (1) (b) (610 SE2d 617) (2005).[6] Accordingly, the trial court erred in determining that EMM Credit had failed to join indispensable parties and in granting a directed verdict or judgment notwithstanding the verdict on EMM Credit's declaratory judgment claim on that basis.[7]

---

[6] The jury was instructed that it must use common sense and reason to decide what testimony to believe or not to believe.

[7] Relying on OCGA § 9-4-7 (a), which provides that "[n]o declaration shall prejudice the rights of persons not parties to the proceeding," appellees also argue

2. EMM Credit contends that the trial court erroneously refused to admit a videotaped deposition of an Allstate representative, Allstate's closing binder, and/or a fully executed First Addendum to the Purchase and Sale Agreement between Allstate and Remington, without the phrase "wholly owned by Buyer" marked through. EMM Credit argues that this evidence was critical to its case because it shows that the parties did not strike through the phrase "wholly owned by Buyer" in the First Addendum and is therefore dispositive as to Remington's ownership of ANHC and the fact that Tony and Gino have no interest in the company and are not indispensable parties. Given our determination in Division 1 that the trial court erred in granting a directed verdict or judgment notwithstanding the verdict on EMM Credit's "true owner" claim, we need not reach this issue.

3. EMM Credit contends that the trial court erred by determining that its fraudulent transfer claim was not assignable.

---

that EMM Credit was precluded as a matter of law from declaring the shares belonging to Gino and Tony invalid. As set forth above, however, Gino and Tony were not prejudiced by not being added as parties to this action. And the jury's determination that Remington was the sole owner of ANHC necessarily required that it disbelieve the evidence that Gino and Tony actually owned any interest in the corporation.

In its Second Amended and Restated Complaint, EMM Credit alleged that the 1996 conveyance of the Property from Remington to ANHC was fraudulent and sought to set it aside. At the time the initial complaint was filed, the Georgia Uniform Fraudulent Transfers Act, OCGA § 18-2-70 et seq. (the "UFTA"), provided that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." OCGA § 18-2-74 (a) (1) (2003). Under the UFTA, a "creditor" is "a person who has a claim," a "debtor" is "a person who is liable on a claim," and a "claim" is "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." OCGA § 18-2-71 (3), (4), (6) (2003). There is no dispute that NCom would qualify as a "creditor" and Remington would qualify as a "debtor," but the applicable version of the UFTA does not specifically address the assignment of claims.[8]

---

[8] The UFTA was amended in 2015 and is now called the Uniform Voidable Transactions Act. See Ga. L. 2015, pp. 996, 1019, § 4A-1. The UVTA now defines "creditor" as "a person who has a claim, regardless of when the person acquired the claim, together with any successors or assigns." OCGA § 18-2-71 (4). In addition, OCGA § 18-2-74 added a subsection (c), which provides that "[i]f a creditor is a

OCGA § 44-12-24 provides that "a right of action is assignable if it involves, directly or indirectly, a right of property. A right of action for personal torts, for legal malpractice, or for injuries arising from fraud to the assignor may not be assigned." In *Security Feed & Seed Co. of Thomasville v. Ne Smith*, 213 Ga. 783 (102 SE2d 37) (1958), the Supreme Court of Georgia construed an earlier version of this statute and held that an assignee of accounts receivable could not maintain an action to set aside an alleged fraudulent deed made prior to the date the accounts receivable were assigned. Id. at 783-784 (1). In *RES-GA Hightower, LLC v. Golshani*, 334 Ga. App. 176 (778 SE2d 805) (2015), this Court determined that the UFTA had not displaced *Ne Smith*'s construction of the statute and held that "an assignee of debt is precluded from pursuing a fraudulent transfer claim even though the assignee meets the definitions of a "creditor" with a "claim" under the UFTA." Id. at 180 (1) (a). And in *Merrill Ranch Properties, LLC v. Austell*, 336 Ga. App. 722 (784 SE2d 125) (2016), a case "factually indistinguishable" from *Golshani* "insofar as both involve standing to assert a fraudulent transfer claim based on the assignment of a debt," this Court

successor or assignee, a right of action under subsection (a) of this Code section is automatically assigned to such successor or assignee." These amendments apply to transfers made or obligations incurred on or after July 1, 2015. See Ga. L. 2015, pp. 996, 1029, § 7-1 (d).

15

held that an assignee of a loan lacks standing under the UFTA to contest property transfers that occurred prior to the assignment. Id. at 732 (3).

Relying on *Golshani*, *Merrill Ranch*, and *Ne Smith*, the trial court granted the motion for directed verdict on EMM Credit's fraudulent transfer claim. EMM Credit contends that those cases are distinguishable because they involve the assignment of a debt and this case involves the assignment of a judgment, and that the applicable statute is not OCGA § 44-12-24, but OCGA § 9-12-21, which provides that

> [a] person in whose favor a judgment has been entered or a person to whom a judgment has been transferred may bona fide and for a valuable consideration transfer any judgment to a third person. In all such cases the transferee of any judgment shall have the same rights and shall be subject to the same equities and to the same defenses as was the original holder of the judgment.

Although *Golshani* did not involve the assignment of a judgment, this Court responded to attempts to distinguish *Ne Smith* on that basis by stating that the case did not turn on whether the assignee had obtained a judgment because "the key inquiry for the Court appeared to be the equitable nature of the claim and its basis in fraud, rather than the source of the creditor's rights vis-à-vis the debtor." *Golshani*, 334 Ga. App. at 180 (1) (a). *Golshani* has recently been extended to a situation where

16

a creditor was assigned the rights to collect on a judgment, and this Court held that the creditor's UFTA claim seeking to set aside a property transfer was unassignable for the reasons set forth in *Golshani*. See *Callaway Blue Springs, LLLP v. West Basin Capital, LLC*, 341 Ga. App. 535, 540 (1) (801 SE2d 325) (2017); see also *RES-GA Loganville, LLC v. Panola Crossings, LLC*, No. A17A0382 at *9 (August 28, 2017) (unpublished) ("*Golshani* makes clear that the rule against the assignment of fraudulent conveyance claims does not turn on whether the assignee has rights flowing from a judgment rather than the underlying loan documents"). And in a very recent decision, the Supreme Court of Georgia expressly agreed "with the reasoning of the Court of Appeals in *Golshani*, *Callaway*, and *Merrill*, that our decision in *Ne Smith* correctly stated the law [regarding an assignee's ability to pursue a fraudulent transfer claim] until it was changed by the enactment of [the] UVTA . . . ." *RES-GA McDonough, LLC v. Taylor English Duma LLP*, ___ Ga. ___ (1) (No. S17A1125; October 30, 2017). Based on existing authority, we are compelled to uphold the trial court's ruling on EMM Credit's fraudulent transfer claim.

EMM Credit also contends that appellees have waived their right to challenge standing because they failed to object to a motion to substitute under OCGA § 9-11-25 (c). EMM Credit is correct that appellees have waived any right to challenge EMM

17

Credit's substitution as a party to this litigation because that issue was resolved in a prior appeal. See *American Nat. Holding Corp. v. EMM Credit, LLC*, 323 Ga. App. 655, 659 (2) (756 SE2d 1) (2013) ("when the trial court explicitly afforded the parties opportunity to be heard on the [substitution] motion, American National advised the court that it had 'no objection to EMM substituting in as NCOM'"). But OCGA § 9-11-25 (c) "is a procedural rule and does not alter the substantive rights of the parties or the successor corporation." *Nat. City Mtg. Co. v. Tidwell*, 293 Ga. 697, 700 (2) (749 SE2d 730) (2013). Nor does it "automatically authorize the continuance of an original action in all cases following the transfer of an interest. If a cause of action does not survive a subsequent transfer of interest, OCGA § 9-11-25 (c), standing alone, would not revive it." *Gene Thompson Lumber Co. v. Davis Parmer Lumber Co.*, 189 Ga. App. 573, 575 (3) (a) (377 SE2d 15) (1988). We have determined, based on existing authority, that NCom's fraudulent transfer claim did not survive the assignment of the California judgment. EMM Credit's substitution as plaintiff under OCGA § 9-11-25 (c) cannot revive it. See id.

EMM Credit contends that Appellees consented to the transferability of NCom's rights in a 1997 Settlement Agreement involving all parties to this appeal. Specifically, EMM Credit relies on two components of the agreement – If NCom is

successful in this case, it can levy on the Property, and the agreement is binding on NCom's successors and assigns. Because EMM Credit will not be successful on its fraudulent transfer claim in this appeal, we need not consider this contention.

*Judgment affirmed in part, reversed in part. Ellington, P. J., and Andrews, J., concur.*